NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr><td>

DENNIS THIGPEN JR.,

                Petitioner,

   v.

PATRICIA MCGILL,

                Respondent.

</td><td>

Civil Action No. 22-2371 (GC)

**OPINION**

</td></tr>
</table>

**CASTNER, District Judge**

      **THIS MATTER** comes before the Court on a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§ 2254") filed by Petitioner Dennis Thigpen Jr. ("Petition"). (ECF No. 1.) Respondent answered the Petition (ECF No. 6), and Petitioner filed a reply brief (ECF No. 15) and other submissions in further support of his Petition (*see* ECF Nos. 13-14, 16, 20, 24-25). The Court has carefully considered the parties' submissions. For the reasons set forth below, and other good cause shown, the Petition is **DENIED** in part and **DISMISSED** in part.

**I.**     **FACTUAL AND PROCEDURAL BACKGROUND**

      In its November 14, 2021 opinion affirming the denial of Petitioner's petition for post-conviction relief ("PCR"), the Superior Court of New Jersey, Appellate Division ("New Jersey Appellate Division") provided the following summary of the factual and procedural background:

> A jury convicted defendant of first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) and N.J.S.A. 2C:5-2, and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). The jury was hung on the remaining charges of murder and possession of a gun for an unlawful purpose, N.J.S.A. 2C:39-4(a). Defendant was tried twice more and each time the jury deadlocked.

The trial court dismissed the two outstanding charges at the State's request.

The State theorized that eighteen-year-old Anthony Skyers was murdered because the Bloods street gang believed he "snitched" on their second-highest ranking member, Dyshon Ragland, and told the police Ragland committed an armed robbery at a restaurant in Tom [sic] River. The State produced multiple witnesses at trial to support its theory, including Ragland's girlfriend, Z.J. During defendant's first trial in 2010, Z.J. testified that on the evening of June 5, 2008, she and Ragland were at her apartment in High Point when Ragland received "between five to seven phone calls." Ragland appeared upset by the calls and told Z.J., referring to Skyers, "I hope he didn't do what I think he did, because if he did, I'm going to have to shut him up." Z.J. also stated a fellow Bloods member, C.B., arrived at the apartment that night, the two men left the apartment together, and Ragland returned alone to the apartment around 1:00 in the morning.

According to Z.J., five minutes after Ragland came home, defendant arrived at the apartment and his "eyes were big like in shock" and he was "very sweaty." Z.J. stated defendant looked "[k]ind of upset" but more "frightened." When she asked defendant why he "look[ed] like he killed someone," defendant did not answer. He and Ragland went into the bathroom together, shut the door and talked with the water running, but Z.J. could not hear what was said. Later that morning, Skyers was found dead in the woods behind the High Point apartment complex. He had two gunshot wounds in the back of his head.

The State also called defendant's former roommate, J.V., to testify. J.V. stated that defendant told her

> he lured [Skyers] to the woods and told [Skyers] to walk up ahead of him and he shot [Skyers]. The first time the safety was on the gun, it didn't go off and [Skyers] turned around and said what are you doing? [Defendant] said, I'm just kidding, go ahead. And then [Skyers] turned around and [defendant] shot him again.

According to J.V., defendant said that before the murder, Bloods members were discussing who would kill Skyers and defendant "was the only one that had the balls to do it." She also stated that defendant bragged: "I killed the kid, I could do it again, it's nothing to kill somebody."

2

More than a year after the murder, C.B. and his cousin, B.N., also a Bloods member, were arrested for multiple counts of unrelated armed robberies. Detective Gregory Staffordsmith interviewed both men on July 6, 2009, and each implicated defendant in Skyers's murder. The following day, defendant was arrested based on Staffordsmith's probable cause affidavit.

The detective's affidavit included statements attributable to C.B. and B.N. For example, it referred to C.B.'s statements that: Ragland invited him to his apartment shortly after the murder; Ragland told him he murdered Skyers and that defendant was present; and C.B. subsequently spoke with defendant, who told him that "Ragland had ordered Skyers['s] murder because Skyers had 'snitched' to the police about Ragland's involvement in the [r]obbery of the Subway in Toms River . . . on February 27, 2008[.]"

Additionally, the affidavit referenced B.N.'s statements that: C.B. contacted him early on June 6, 2008 to advise that Ragland and another unknown male took C.B. to a wooded area behind Ragland's apartment complex to show him the dead body of Anthony Skyers; and during that meeting, Ragland told C.B. he murdered Skyers.

Pertinent to this appeal, the State admits Staffordsmith's affidavit also contained three statements which were partially incorrect. The phrases comprising the admitted misstatements are underscored: (1) "Mr. Ragland and [defendant] then took [C.B.] in [the] wooded area behind the High Point Apartments and showed [C.B.] the dead body of Anthony Skyers"; (2) "[defendant] . . . told [B.N.] that he had murdered Anthony Skyers on the orders of Dyshon Ragland"; and (3) "[defendant] advised [C.B.] that he had murdered Skyers on the orders of Dyshon Ragland." (Emphasis added).

The State called C.B. and B.N. to testify during defendant's first trial and their testimony was consistent with the unchallenged portions of Staffordsmith's probable cause affidavit. For example, C.B. stated that Ragland ordered him to go to Ragland's apartment after the murder, and that Ragland took him to the woods behind the apartment complex to show him Skyers's corpse. C.B. also testified that Ragland told him he "killed [Skyers]," that "[Skyers] had to go," and "this is what happens when somebody snitches."

Additionally, C.B. stated that before the murder, defendant was trying to join the Bloods, and by the fall of 2008, he was a new member of the gang. Defendant immediately held a high-ranking

position, which was unusual because new members usually start at a low-level position and work their way up by committing crimes. Defendant told some Bloods members that he gained his high rank because he killed Skyers. C.B. stated that defendant also talked about the murder a second time while he, defendant and other Bloods members were riding in a car on their way to Newark.

B.N. testified that approximately a year after the murder, defendant told him, "the way [defendant] was raised, when people snitch on you, you got to handle that." B.N. asked defendant if he was talking about Skyers and defendant responded, "yeah." Defendant also told B.N. that defendant achieved his rank in the Bloods because of "the whole thing with [Skyers]."

In anticipation of a retrial, defendant moved to suppress evidence resulting from Staffordsmith's probable cause affidavit, pursuant to Franks v. Delaware, 438 U.S. 154 (1978). The motion was denied in June 2011.

Because defense counsel was disbarred after the first trial, successor counsel assumed defendant's representation. Defendant's new attorney moved to suppress the statements B.N. and C.B. gave to Staffordsmith during their 2009 interviews. He submitted a certification with the motion in January 2012, stating "the representations made by Det. Gregory Staffordsmith . . . were misleading and incomplete." But counsel's certification did not specify which representations in the probable cause affidavit were "misleading and incomplete." The suppression motion was denied on June 14, 2012.

Less than two weeks later, Staffordsmith was called by the defense to testify at the second trial. During defense counsel's examination, Staffordsmith admitted his probable cause affidavit contained an error. Specifically, he acknowledged the words, "and [defendant]" should not have been included in the following statement attributed to C.B.: "Mr. Ragland and [defendant] then took [C.B.] in [a] wooded area behind the High Point Apartments and showed [C.B.] the dead body of Anthony Skyers." While on the stand, Staffordsmith also denied he "put something in [the affidavit] knowing[ ] that it was wrong[,]" explaining he "wasn't aware there was a mistake at the time[.]" Further, the detective stated he did not alert the assistant prosecutor who handled the case to the error. According to Staffordsmith's testimony, the mistake was "later corrected[.]" The record does not reveal when or how the correction occurred.

Based on the limited record before us, it appears that only when defendant stood trial for a third time in 2013 did Staffordsmith admit to the two remaining misstatements in his probable cause affidavit, i.e., that defendant "advised [C.B.] that he had murdered Skyers <u>on the orders of Dyshon Ragland</u>" and that defendant "told [B.N.] that he had murdered Anthony Skyers <u>on the orders of Dyson Ragland</u>." (Emphasis added). An excerpt of the trial transcript reveals that when defense counsel asked Staffordsmith about these misstatements, Staffordsmith asked for clarification. Specifically, the detective inquired, "is your question whether or not your client shot [Skyers] or was he ordered to shoot him?" Defense counsel responded, "[o]rdered to shoot him." Staffordsmith replied that there was "nothing specific about an order to shoot [Skyers]" and that it was a mistake for the affidavit to read that either C.B. or B.N. told him defendant "was ordered to [shoot Skyers] by . . . Ragland." Critically, however, Staffordsmith did not testify he made a mistake by swearing C.B. and B.N. told him defendant "had murdered Anthony Skyers."

Following defendant's third trial, the court sentenced defendant to an aggregate prison term of seventeen years with an eighty-five percent parole disqualifier pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed his convictions and sentence on direct appeal. <u>State v. Thigpen</u>, No. A-2490-14T2 (App. Div. Aug. 11, 2017). In 2018, the Supreme Court denied certification. <u>State v. Thigpen</u>, 232 N.J. 146 (2018).

In February 2018, defendant filed a timely pro se PCR petition. He argued his first trial attorney provided ineffective assistance of counsel, and that he was convicted based on police and prosecutorial misconduct, as well as various Fourteenth Amendment violations. After PCR counsel was appointed, he supplemented defendant's petition, arguing that defendant's first trial counsel was ineffective for failing to: "seek to dismiss the [i]ndictment[,]" given Staffordsmith's flawed affidavit; request a hearing to address Staffordsmith's misstatements; "conduct a proper investigation," which "at a bare minimum," would have included "interviewing potential witnesses"; call Staffordsmith to testify; and uncover the two misstatements successor counsel later discovered. Moreover, PCR counsel contended that even if each of his first attorney's errors individually did not deprive him of the effective assistance of counsel, cumulatively, they did. Lastly, PCR counsel argued appellate counsel was ineffective for failing to "properly raise [the] issues asserted herein that could have been raised on appeal."

The PCR judge heard argument on defendant's PCR petition in July 2019, at which time defendant briefly addressed the court. Thereafter, defendant submitted a handwritten letter to the judge, which was considered without objection from either party. On August 1, 2019, the judge denied the petition without an evidentiary hearing.

The PCR judge concluded that defendant's claims about Staffordsmith's affidavit were procedurally barred under Rules 3:22-4 and -5. He reasoned that defendant had twice moved to suppress evidence based on the misstatements in Staffordsmith's affidavit, and then failed to challenge the denial of the motions on direct appeal.

The judge also found defendant "failed to show a prima facie case of ineffective assistance of trial or appellate counsel." He specifically rejected the notion that the post-trial disbarment of defendant's first attorney, without more, demonstrated defendant received ineffective assistance of counsel. Indeed, the judge found defendant failed to show "how his counsel's disbarment post-trial had any effect on the proceedings." Moreover, the judge stated that his review of the trial transcript showed defendant's first attorney was "engaged, zealous and motivated[,]" and that the transcript "belie[d] any claim that trial counsel was inattentive, unprepared or ineffective." Additionally, the judge concluded defendant was properly counseled about his right to testify during the first trial. The judge noted that at his first trial, defendant was asked if he had a "full and fair opportunity to make [the] decision" about testifying and "underst[ood] all [his] options," and defendant "answered, 'Yes, sir' to both questions." Accordingly, the judge found defendant was "informed thoroughly on the advantages and disadvantages of testifying in court" and "intelligently exercised his constitutional right to remain silent."

Further, the judge declined to find defendant's first attorney was ineffective for failing to call Staffordsmith as a witness, concluding counsel's decision not to call the detective demonstrated "sound strategy" because "calling a hostile witness" to highlight an incorrect statement in an affidavit would have allowed the State to cross-examine the detective, and "elicit testimony harmful to [defendant]." Additionally, the judge found there was no merit to defendant's claim that trial counsel was ineffective for failing to move to dismiss the indictment, particularly given that successor counsel was unsuccessful when he moved to dismiss the indictment.

Similarly, the judge rejected defendant's argument that the

6

> State committed prosecutorial misconduct by relying heavily on
> hearsay testimony during grand jury proceedings. The judge noted
> that defendant "relie[d] upon outdated case law" to challenge the
> propriety of the grand jury proceedings.
>
> Regarding defendant's contention that his appellate counsel
> was ineffective, again, the judge was not persuaded. The judge
> found that although defendant argued "[a]ppellate counsel failed to
> properly raise those issues asserted herein that could have been
> raised on direct appeal," PCR counsel neglected "to . . . address what
> issues appellate counsel allegedly failed to raise."

*State v. Thigpen*, No. A-0040-19, 2021 WL 5895639, at *1-5 (N.J. Super. Ct. App. Div. Dec. 14,

2021) (per curiam) (cleaned up).[1]

Under the first point of his state PCR appeal, Petitioner argued that the PCR court's legal

and factual conclusions disposing of his claims regarding the Staffordsmith affidavit were patently

erroneous and based on an inadequate record and speculative arguments. *See id.* at *5. According

to Petitioner: (1) his claims regarding the affidavit were not procedurally barred by New Jersey

Court Rule 3:22-5 because no court had ever adjudicated the issue of whether suppression was

required due to every misrepresentation in the affidavit; (2) the PCR court erroneously concluded

that such claims were procedurally barred because a second motion to suppress had been filed

prior to his third trial; and (3) it erred by concluding that he was not entitled to relief because the

issue of the numerous false statements in the affidavit should have been raised on direct appeal.

*See id.* Petitioner argued in Point II that the PCR court failed to consider and resolve Petitioner's

*pro se* claims for PCR and, in Point III, that the matter should be remanded because PCR counsel's

legal representation fell below the applicable professional standard. *See id.* In his reply brief,

Petitioner claimed that the PCR court relied on the State's false representation to deny the PCR

---

[1]    The New Jersey Appellate Division used initials to identify the State's witnesses "[g]iven
the nature of the crime." *State v. Thigpen*, No. A-2490-14T2, 2017 WL 3443100, at *1 n.3 (N.J.
Super. Ct. App. Div. Aug. 11, 2017).

petition and that, instead of acknowledging this fact, the State merely offered speculative arguments to shield the affidavit from judicial scrutiny. *See id.*

On December 14, 2021, the New Jersey Appellate Division affirmed the PCR court's order denying Petitioner's PCR petition. *Id.* at *1, *5-8. It began with the "Point I arguments, which collectively challenge the PCR judge's finding that defendant's ineffective assistance claims about the misstatements in Staffordsmith's affidavit were barred under Rules 3:22-4 and -5."[2] *Id.* at *6. The New Jersey Appellate Division disagreed with the PCR court's finding that the ineffectiveness claims were procedurally barred, noting that they involved alleged legal errors not contained completely within the trial record (and thus not ripe for direct appellate review), such claims were better suited for a PCR proceeding because some of the issues implicated strategic decisions, and, given the partial record and the assertions about when Staffordsmith's misstatements were discovered, "we are not convinced defendant's contentions regarding the probable cause affidavit were barred under Rule 3:22-5."[3] *Id.* However, "[t]o the extent defendant attempted to raise substantive contentions relating to the Staffordsmith affidavit in his PCR petition, such as prosecutorial misconduct, [the New Jersey Appellate Division] would agree such claims are barred under Rule 3:22-4, because they could have been brought on direct appeal." *Id.* at *6 n.7 (citing

---

[2]    New Jersey Court Rule 3:22-4 provides that, "[u]nless one of 'the prescribed exceptions' apply, claims that could have been, but were not, raised in prior proceedings cannot be asserted on PCR." *Thigpen*, 2021 WL 5895639, at *5 (quoting *State v. Precoise*, 129 N.J. 451, 476 (1992)). "[U]nder Rule 3:22-5, '[a] prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulted in the conviction or in any post-conviction proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such proceedings.'" *Id.* (alteration in original).

[3]    Petitioner did not provide a transcript from the motion hearing or other documentation from the first motion to suppress to the PCR judge, and neither party was able to find the trial court's 2011 decision denying the first suppression motion, although the State did furnish the PCR judge with a Promis/Gavel print out to establish the motion was denied. *See Thigpen*, 2021 WL 5895639, at *3 n.3. Similarly, no transcript of the hearing on the second motion to suppress was supplied to the PCR judge or the New Jersey Appellate Division. *See id.* at *3 n.4.

*State v. Quezada*, 402 N.J. Super. 277, 280 (App. Div. 2008)).

Considering the ineffectiveness claims on their merits, the New Jersey Appellate Division was "persuaded" that they lacked merit and the PCR judge properly denied the petition without an evidentiary hearing. *Id.* at *6. Specifically, it determined that the Petitioner failed to satisfy the prejudice prong under *Strickland v. Washington*, 466 U.S. 668 (1984), "particularly given that the State produced strong evidence of defendant's guilt through testimonial evidence" and "the record demonstrates that even if the three misstatements were excised from the affidavit, the police still had probable cause to arrest him." *Id.* (citing *State v. Howery*, 80 N.J. 563, 568 (1979)). "Similarly, defendant failed to show how he was prejudiced by appellate counsel's purported errors." *Id.*

As to Petitioner's other points, the New Jersey Appellate Division concluded with respect to Point II that the PCR court adequately addressed Petitioner's *pro se* claims and that, given Petitioner's conclusory and vaguely worded assertions, "it was not the role of the PCR judge, nor is it the role of this court to weave together the fabric of an argument on defendant's behalf."[4] *Id.* It further declined to address the arguments raised in Point III because they should be raised in a new PCR proceeding and stated that, "[t]o the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in our written opinion." *Id.* (citing N.J. Ct. R. 2:11-3(e)(1)(E)).

The New Jersey Supreme Court denied Petitioner's petition for certification on March 30,

---

[4]     Petitioner provided "the following response in his pro se petition where he was directed to 'state with specificity the facts upon which the [PCR] claim for relief is based, legal arguments and all claims:'" "Newly Discovered Evidence, Evidence hearing, Prosecutorial misconduct, and violated my [Fourteenth] [A]mendment[ ] right, and <u>Frank [v.] Delaware</u> hearing, and [p]olice misconduct, Ineffective Counsel on [my first trial attorney]." *Thigpen*, 2021 WL 5895639, at *7 (alterations in original). "From this abbreviated list of claims, defendant contends that "[l]eft unaddressed in the PCR court's written opinion were [defendant's] claims of newly discovered evidence, 'evidence hearing,' [Fourteenth] Amendment violation and police misconduct." *Id.*

2022. *See State v. Thigpen*, 250 N.J. 174 (2022) (order).

On or about April 7, 2022,[5] Petitioner filed his Petition. (ECF No. 1.)  In this Petition, he purports to raise one ground for relief (recited herein verbatim):

> Violation of my 14th Amendment rights.  Det. Gregory Staffordsmith of Lakewood, N.J. Police Dept. put 3 false statements in the affidavit used to have me arrested and one was falsely placing me at the scene of the murder, and he confessed to all 3 false statements in my second and third trial, and the prosecutor Michael Weatherstone confessed that he approved the affidavit knowing it had false statements in the affidavit.

(*Id.* at 6.)  Petitioner acknowledges that this claim was not raised on direct appeal, stating that "[his] direct appeal lawyer said that she couldn't raise[ ] that issue because it didn't come out in the trial in which [Petitioner] was found guilty." (*Id.* at 7.)

On June 23, 2022, Respondent answered the Petition (ECF No. 6), and Petitioner filed a reply brief on or about July 22, 2022 (ECF No. 15).  Petitioner has filed several additional submissions in support of his Petition (*see* ECF Nos. 13-14, 16, 20, 24-25) and requests an evidentiary hearing (ECF No. 25).[6]

## II.    STANDARDS OF REVIEW

An application for writ of habeas corpus by a person in custody under judgment of a state

---

[5]    *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998) (holding that a *pro se* prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court).

[6]    In his filings, Petitioner opposed Respondent's motion to seal certain exhibits and clarified that he did not request the sealing of state court documents that he filed with this Court. (*See* ECF Nos. 14, 18.)  After the Court denied Respondent's motion to seal without prejudice, Respondent withdrew his request, and the Court lifted the temporary seals on the documents filed in ECF Nos. 8 and 16. (ECF Nos. 21-23.)

In addition, some pages in Petitioner's filings are illegible.  (*See* ECF No. 15 at 3, 5.)  However, the Court is satisfied that he has been provided a reasonable opportunity to litigate his habeas claims and that it has a full understanding of his arguments.

court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).

"[B]efore a federal court may consider the merits of a § 2254 habeas petition, an inmate ordinarily must exhaust the state-court remedies for the claimed violation of federal law." *Ross v. Adm'r E. Jersey State Prison*, 118 F.4th 553, 562 (3d Cir. 2024) (citing 28 U.S.C. § 2254(b)(1)(A)); *see also* 28 U.S.C. § 2254(b)(1)(B) (enumerating exceptions). A petitioner exhausts state court remedies by fairly presenting the factual and legal basis of his federal law claims to the state trial court, its intermediate appellate court, and the state supreme court. *See Ross*, 118 F.4th at 564. State court remedies are exhausted when they are no longer available. *See Id.* at 565.

However, when state court remedies are no longer available, "the claim may still be subject to dismissal on procedural-default grounds." *Id.* (footnote omitted) (citing *Marsalis v. Pa. Dep't of Corr.*, 37 F.4th 885, 889 (3d Cir. 2022); *Whitney v. Horn*, 280 F.3d 240, 252 (3d Cir. 2002)). "Ordinarily, for procedural default, a state-court decision must contain a 'plain statement' that its ruling rests on such an adequate and independent state-law ground." *Id.* (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)). In the absence of a recognized excuse for the procedural default, a habeas court may not review the merits of the procedurally defaulted federal claim. *See id.*

A petitioner can avoid procedural default by showing "cause and prejudice." *See id.* "Cause" requires showing that there was an objective reason the petitioner could not comply with the procedural rule. *See id.* at 565-66. "Prejudice" means "that the constitutional violation

11

'worked to his *actual* and substantial disadvantage.'" *Shinn v. Ramirez*, 596 U.S. 366, 379-80 (2022) (emphasis in original) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  A petitioner can avoid procedural default by establishing a "fundamental miscarriage of justice," which requires a plausible showing of actual innocence. *See Epps v. Chetirkin*, No. 21-16719, 2025 WL 602983, at *4 (D.N.J. Feb. 25, 2025), *appeal filed*, No. 25-1472 (3d Cir. Mar. 17, 2025).

Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bell v. Cone*, 535 U.S. 685, 698 (2002)).  To obtain relief under the "contrary to" clause of § 2254(d)(1), a Petitioner must show that the state court applied a rule different from the governing law of the Supreme Court or decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell*, 535 U.S. at 694.  Under the "unreasonable application" prong, the federal habeas court asks whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams*, 529 U.S. at 409.  Thus, "a federal habeas court may not issue a writ simply because the court concludes in its independent judgment that the relevant

state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 338-39 (2006).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 538 U.S. 19, 25 (2002) (per curiam)). A petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *See id.*

In applying AEDPA's standards, the relevant state court decision is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (quoting *Coleman v. Thompson*, 501 U.S. 722, 740 (1991)); *see also Rambo v. Adm'r E. Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine).

## III.  DISCUSSION

In his Petition, Petitioner purports to raise only one claim or ground for relief: that his Fourteenth Amendment rights were violated because Staffordsmith included three false statements in the affidavit used to have Petitioner arrested; the detective confessed to all three false statements in Petitioner's second and third trials; and the prosecutor confessed that he approved the affidavit

despite knowing of the false statements. (ECF No. 1 at 6.)  The Court agrees with Respondent that this substantive misconduct claim has been procedurally defaulted, Petitioner fails to overcome this default by showing either cause and prejudice, or a fundamental miscarriage of justice, and, in any event, the claim fails on its merits. (*See* ECF No. 6 at 12-17.)

Respondent states that "[i]t is noteworthy that Petitioner does not mention ineffective assistance of trial or appellate counsel in his habeas petition." (*Id.* at 9.)  Respondent contends that this ineffectiveness claim is waived on habeas review.  (*Id.*)  However, out of an abundance of caution, the Court construes the Petition as alleging such a claim.  First, it is well established that *pro se* filings, like this Petition, must be liberally construed. *See James v. New Jersey*. No. 24-8271, 2024 WL 2412192, at *2 (D.N.J. Sept. 17, 2024).  Second, in the Petition, Petitioner notes that he raised ineffectiveness claims in his PCR proceeding and arguably indicates that the substantive claim was not raised on direct appeal because of the ineffective assistance of his appellate counsel.  (ECF No. 1 at 4-7.)  Third, unlike the substantive contentions raised in Petitioner's PCR petition, which the New Jersey Appellate Division found were barred under New Jersey Court Rule 3:22-4, the ineffectiveness claim was decided on the merits by the state courts. *See Thigpen*, 2021 WL 589539, at *6-7 & n.7.  Fourth (and finally), Respondent and Petitioner (in his reply) have briefed the merits of the claim.  (ECF No. 6 at 9-11; ECF No. 15 at 4.).

Considering the merits of the ineffectiveness claim, the Court concludes that the New Jersey Appellate Division's ruling denying Petitioner's claim of ineffective assistance of counsel was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor was it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

14

A. **Ineffective Assistance of Counsel**

The New Jersey Appellate Division was "persuaded Defendant's ineffective assistance of counsel claims lack merit and that the [PCR] judge properly denied his petition" without conducting an evidentiary hearing:

> To succeed on a claim of ineffective assistance, a defendant must establish, first, that "counsel's representation fell below an objective standard of reasonableness" and, second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). A defendant must do more than demonstrate that an alleged error might have "had some conceivable effect on the outcome of the trial." State v. Sheika, 337 N.J. Super. 228, 242 (App. Div. 2001). A defendant must prove the error is so serious as to undermine the court's confidence that the "defendant's trial was fair, and that the jury properly convicted him." State v. Pierre, 223 N.J. 560, 588 (2015).

> There is no question but that a defendant's "right to effective assistance includes the right to the effective assistance of appellate counsel on direct appeal." State v. O'Neil, 219 N.J. 598, 610-11 (2014). But appellate counsel need not advance every argument a defendant urges, even if non-frivolous. Jones v. Barnes, 463 U.S. 745, 750-54 (1983).

> . . . .

> Here, we are satisfied defendant did not establish a prima facie claim of ineffective assistance of trial or appellate counsel because he did not satisfy the prejudice prong under Strickland. Stated differently, defendant failed to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 687-88, particularly given that the State produced strong evidence of defendant's guilt through testimonial evidence. Accordingly, we need not address whether counsel's performance was deficient. See State v. Gaitan, 209 N.J. 339, 350 (2012) (citations omitted) ("Although a demonstration of prejudice constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient.").

> We reach this conclusion because although defendant seeks relief based on Staffordsmith's affidavit, the record demonstrates that even if the three misstatements we have discussed were excised from the affidavit, the police still had probable cause to arrest him. See State v. Howery, 80 N.J. 563, 568 (1979). In fact, the balance of the affidavit included statements from C.B. and B.N. that: defendant confessed to murdering Skyers (albeit without saying he was ordered by Ragland to do so); C.B. was told by Ragland that defendant "was present" for the murder; and defendant told C.B. that Ragland ordered Skyers's murder because Skyers had "snitched" to the police about Ragland's involvement in a robbery.

> Similarly, defendant failed to show how he was prejudiced by appellate counsel's purported errors. As the PCR judge aptly noted, PCR counsel neglected "to . . . address what issues appellate counsel allegedly failed to raise."

*Thigpen*, 2021 WL 5895639, at *6-7.

According to Petitioner, Respondent continues to protect the detective and trial prosecutor, who conspired to have him arrested, prosecuted, convicted and serve thirteen years in prison for crimes he did not commit based on false statements. (ECF No. 15 at 2, 4, 6.) He indicates that the trial prosecutor thereby violated his paramount obligation to seek justice. (*Id.* at 1 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds*, *Stirone v. United States*, 361 U.S. 212 (1960)).

With respect to the probable cause determination, Petitioner asserts that, under *Franks*, if the three false statements were excised from the affidavit, the police would not have had probable cause to arrest him. (ECF No. 15 at 2, 10.) According to Petitioner, but for the inclusion of the false statements in the affidavit, and the trial prosecutor's approval of the affidavit knowing it contained such falsehoods, "[he] wouldn't have been in prison for 13 years." (*Id.* at 4.) Petitioner further indicates that Staffordsmith confessed to including a *fourth* false statement in the affidavit—that "[Petitioner] had told [C.B.] that Ragland had ordered Skyers death for snitching." (*Id.* at 2.) While the detective testified that he merely made a mistake, Petitioner questions how

Staffordsmith could have made that many mistakes given his access to the two witnesses' recorded statements, and Petitioner suggests that the false statements were intentionally added because the State never produced any physical or forensic evidence against him (or, at the very least, that the detective acted with reckless disregard for the truth by including the statements in the affidavit). (*Id.* at 12.) He argues that the prosecutor similarly "confess[ed] to approving the affidavit knowing it had false statements in the affidavit." (*Id.* at 2.) The prosecutor, at the second trial, "stated that he had access to the video, and that the false statement was pointed out to him, and the Prosecutor stated twice that it was his fault." (*Id.* at 11 (invoking "false in one, false in all" maxim)). Petitioner disputes Respondent's assertion that the false statements were corrected because the detective also testified that he never made the corrections. (ECF No. 15-3 at 1.) As to the remaining statements in the affidavit, Petitioner claims that they were hearsay; C.B. and C.B.'s cousin, B.N., had been arrested for eight and six robberies, respectively, and were facing over a 100 years in prison if convicted; C.B. and B.N. accordingly decided to lie to get reduced sentences, and they acknowledged at the second and third trials that they were testifying to help themselves and would not have been on the stand if they had not been caught for the robberies; and Respondent knew that C.B. and B.N. were not credible because C.B. made a prior statement denying any knowledge of the murder three weeks after it occurred. (*Id.;* ECF No. 15 at 11.)

Petitioner asserts that, if his attorney had called the detective to testify, his testimony "would have had a big impact in [his] trial" because the jury, having heard Staffordsmith confess to the multiple false statements and the prosecutor admit to approving the affidavit knowing it contained false statements in it, would have found that neither individual was credible and that the whole case against him was built on falsehoods. (ECF No. 15 at 4 (emphasis omitted).) Petitioner notes that the detective did testify at his second and third trials, which resulted in hung juries. (*Id.*)

17

Petitioner fails to show that the New Jersey Appellate Division acted contrary to, or unreasonably applied, clearly established federal law, or unreasonably applied the facts in denying Petitioner's ineffectiveness claim.

### 1.    "Contrary to" Prong

Initially, the New Jersey Appellate Division's disposition of the ineffectiveness claim was not "contrary to" clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), because it applied the correct two-prong *Strickland* test for evaluating claims of ineffective assistance of counsel. *Thigpen*, 2021 WL 5895639, at *6 (quoting *Strickland*, 466 U.S. at 694). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. Counsel is strongly presumed to have provided constitutionally adequate assistance. *See id.* at 690.

Second, the petitioner must show prejudice, *i.e.*, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693). An attorney "does not act deficiently or create prejudice by failing to raise or prevail on a meritless argument." *Minaya v. United States*, No. 21-18050, 2023 WL 3338626, at *3 (D.N.J. May 10, 2023) (citing *United States v. Sanchez*, 53 F. App'x 208, 210 (3d Cir. 2002); *see also McBride v. Kuhn*, No. 22-2016, 2025 WL 1119479, at *5 (D.N.J. Apr. 14, 2025) (stating that counsel cannot be ineffective for declining to raise a meritless issue), *certificate of*

18

*appealability denied*, No. 23-2393, 2023 WL 11892827 (3d Cir. Nov. 8, 2023).  A court need not determine whether counsel's performance was deficient if it is easier to dispose of the claim under the prejudice prong.  *See Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010).

In applying the prejudice prong, the New Jersey Appellate Division explained that, "although defendant seeks relief based on Staffordsmith's affidavit, the record demonstrates that even if the three misstatements we have discussed were excised from the affidavit, the police still had probable cause to arrest him." *Thigpen*, 2021 WL 5895639, at *7 (citing *Howery*, 80 N.J. at 568).  It thereby relied on the governing standard established by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978).  Under this standard, "the defendant must make a 'substantial preliminary showing' of falsity in the warrant" by alleging "deliberate falsehood or reckless disregard for the truth." *Howery*, 80 N.J. at 567 (quoting *Franks*, 438 U.S. at 567).  "[T]he misstatements claimed to be false must be material to the extent that when they are excised from the affidavit, that document no longer contains facts sufficient to establish probable cause." *Id.* at 568 (quoting *Franks*. 438 U.S. at 171); *see also Thigpen*, 2021 WL 5895639, at *3 n.2 (quoting *Franks*, 438 U.S. at 171).

Furthermore, the New Jersey Appellate Division recognized that, although "a defendant's right to effective assistance includes the right to the effective assistance of appellate counsel on direct appeal," *Thigpen*, 2021 WL 5895639, at *6 (quoting *O'Neil*, 219 N.J. at 610-11), the "appellate counsel need not advance every argument a defendant urges, even if non-frivolous," *id.* (citing *Jones*, 463 U.S. at 750-54).  Appellate counsel instead should select the nonfrivolous issues that maximize the likelihood of success.  *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (discussing *Jones*).  Generally, the presumption of effective assistance of counsel will only be rebutted when the omitted issues are clearly stronger than the issues raised in the appeal.  *See id.*

(quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

### 2.    Unreasonableness

Because the New Jersey Appellate Division's ruling did not contradict clearly established federal law, Petitioner may obtain federal habeas relief only if he demonstrates that the ruling involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. Under this deferential standard, the New Jersey Appellate Division reasonably determined that: (1) even if the three false statements were excised, the police still had probable cause pursuant to the *Franks* standard to arrest Petitioner because of "the balance of the affidavit;" (2) Petitioner failed to establish a reasonable probability of a different result "given that the State produced strong evidence of defendant's guilt through testimonial evidence;" and (3) "defendant failed to show how he was prejudiced by appellate counsel's purported errors." *Thigpen*, 2021 WL 589639, at *7.

### a.    Probable Cause to Arrest Petitioner Under *Franks*

According to the New Jersey Appellate Division, the affidavit included statements from C.B. and B.N. that: "defendant confessed to murdering Skyers (albeit without saying he was ordered by Ragland to do so); C.B. was told by Ragland that defendant 'was present for the murder;' and defendant told C.B. that Ragland ordered Skyers's murder because Skyers had 'snitched' to the police about Ragland's involvement in a robbery." *Id.* Specifically, in his excised affidavit, Staffordsmith averred that, on June 6, 2008, at 9:21 a.m., Skyers's body was found on a trail connecting Wyndham Place II Condominiums to the High Point Apartments in Lakewood, the victim was pronounced dead at the scene at 11:20 a.m., and the cause of death was gunshot wounds to the head and neck. (ECF No. 15 at 8.) On July 6, 2009, the detective (together with Investigator Carlos Trujillolovar) interviewed B.N. in regard to the June 2008 homicide of Skyers,

and B.N. stated the following:

> In the early hours of June 6, 2008, [C.B.] contacted [B.N.] and
> advised him that an individual he identified as Dyshon Ragland and
> another unknown male took him to the wooded area behind the High
> Point apartments and showed him the dead body of Anthony Skyers.
> During that meeting, Mr. Ragland told [C.B.] that he had murdered
> Anthony Skyers. [B.N.] also advised that approximately a week
> ago, he met an individual identified as "Po." As a result of
> investigation, "Po" was identified as Dennis Thigpen, Jr. During the
> said meeting, Mr. Thigpen a.k.a. "Po" told [B.N.] that he had
> murdered Anthony Skyers [redacted].

(*Id.* (alterations added).) Staffordsmith and Trujillolovar then questioned C.B., who told them:

> On June 5, 2008, Mr. Ragland contacted [C.B.] inviting him to come
> over to his apartment, located at the High Point Apartment. Upon
> arriving, Mr. Ragland told him that he had murdered Anthony
> Skyers and that Dennis Thigpen a.k.a. "Po" was present. Mr.
> Ragland told [C.B.] that he murdered Skyers because Skyers
> "snitched" to the police about Ragland's involvement in the robbery
> of the Subway in Toms River, NJ on February 27, 2008. Mr.
> Ragland and [redacted] then took [C.B.] in [a] wooded area behind
> the High Point Apartments and showed [C.B.] the dead body of
> Anthony Skyers. [C.B.] further advised this affiant that he had a
> subsequent conversation with "Po" where "Po" advised [C.B.] that
> he had murdered Skyers [redacted]. "Po" told [C.B.] had ordered
> [the] Skyers murder because Skyers had "snitched" to the police
> about Ragland's involvement in the robbery of the Subway in Toms
> River, NJ on February 27, 2008.

(*Id.* at 9 (alterations added).)

Petitioner argues that Staffordsmith admitted to a (fourth) false statement in the affidavit,

specifically, that "'Po' told [C.B.] had ordered [the] Skyers murder because Skyers had "snitched"

to the police about Ragland's involvement in the robbery of the Subway in Toms River, NJ on

February 27, 2008." (ECF No. 15 at 2, 15.) But the New Jersey Appellate Division found that,

while Staffordsmith acknowledged that "it was a mistake for the affidavit to read that either C.B.

or B.N. told him defendant 'was ordered to [shoot Skyers] by . . . Ragland," *Thigpen*, 2021 WL

5895639, at *3 (alterations in original), C.B. did say that "defendant told C.B. that Ragland ordered

Skyers's murder because Skyers's had 'snitched' to the police about Ragland's involvement in a robbery," *id.* at *7. Petitioner has not met his burden to rebut this finding of fact by clear and convincing evidence. *See Rice*, 546 U.S. at 338-39 (petitioner bears the burden of rebutting presumption by clear and convincing evidence). In fact, as the New Jersey Appellate Division indicated, the detective testified at the second trial that neither C.B. nor B.N. said that Petitioner told them that Ragland *ordered Petitioner* to shoot Skyers; Staffordsmith did not deny that C.B. told the detective that Petitioner informed C.B. that Ragland ordered Skyers's murder because Skyers was a "snitch." (*See* ECF No. 1-2 at 18:2-22:24.)

It was objectively reasonable for the New Jersey Appellate Division to conclude that the redacted or excised affidavit, which included statements that Petitioner confessed to murdering Skyers and that the person who ordered the murder said that Petitioner "was present" for the murder, provided probable cause to arrest Petitioner. While Petitioner notes that the statements constituted hearsay (ECF No. 15 at 11), a warrant affidavit "may incorporate hearsay or indirect evidence." *United States v. Christopher*, No. 20-491, 2021 WL 3910152, at *14 (D.N.J. Sept. 1, 2021) (citing *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002); *United States v. Jones*, 994 F.2d 1051, 1056-57 (3d Cir. 1993)); *see also Evans v. City of Newark*, No. 14-120, 2023 WL 2535283, at *18 n.9 (D.N.J. Mar. 16, 2023) ("Police may rely on hearsay evidence to supply the probable cause necessary to make an arrest." (citing *Franks*, 438 U.S. at 164-65; *United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004); *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006)). C.B. and B.N. were identified by their full names in the affidavit, C.B.'s and B.N.'s statements to the police were consistent with each other, and their respective statements were also consistent with the physical circumstances of the homicide (*e.g.*, C.B. stated that Ragland and another unknown male took him in the early hours of June 6 to the wooded area behind the High Point

22

Apartment to shown him Skyers's body, and the decedent's body was found around 9 a.m.).[7] *See*

*United States v. Baer*, 843 F. App'x 472, 477 (3d Cir. 2021) (concluding that law enforcement had

a substantial basis for crediting hearsay statements from various witnesses that either directly or

indirectly corroborated each other and were corroborated by the physical evidence).

> **b.     The Reasonable Probability of a Different Result at Petitioner's First Trial**

Likewise, the New Jersey Appellate Division reasonably concluded that Petitioner did not

show that he was prejudiced by his counsel's allegedly deficient performance at his first trial

because "the State produced strong evidence of defendant's guilt through testimonial evidence."

---

[7]     Additionally, Petitioner challenges the probable cause determination on the grounds that C.B. and B.N. were arrested for "8 and 6 robberies," respectively; C.B. made a prior statement three weeks after the murder denying any knowledge of the crime; C.B. and B.N. decided to lie because they were facing 100 years in prison; Staffordsmith and the prosecutor indicated that they corrected the false statements but the detective also testified that he never made the corrections; and the prosecutor admitted that he approved the affidavit despite knowing it contained false statements. (ECF No. 15-3 at 1.) However, Petitioner's assertions are insufficient to satisfy his heavy burden under AEDPA to show that the New Jersey Appellate Division's ruling constituted an unreasonable application of United States Supreme Court precedent or was based on an unreasonable factual determination. As to the alleged credibility issues with respect to C.B. and B.N., the Court notes that Petitioner has not exhausted the claim that his trial counsel was ineffective for failing to challenge the affidavit on the grounds that it omitted material details regarding the witnesses' prior statements and criminal exposure. (*See generally* ECF No. 7-6 (Pet'r's PCR App. Br.) (not raising omissions issue); *Ross*, 118 F.4th at 562 (addressing exhaustion requirement); *United States v. Syed*, No. 22-818, 2025 WL 635300, at *20 (D.N.J. Feb. 27, 2025) ("'A *Franks* hearing is appropriate where a defendant alleges material omissions in a warrant, rather than an affirmative falsity' and is granted in 'rare instances.'" (quoting *United States v. Harper*, No. 20-806, 2021 WL 3856190, at *7 (D.N.J. Aug. 26, 2021)). In any event, Petitioner fails to show that the omissions were material to the finding of probable cause. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Syed*, 2025 WL 635300, at *20 (stating that a defendant is entitled to a hearing only if he or she makes a substantial showing that the omitted facts were necessary to the finding of probable cause). As the Court explains in more detail in its assessment of the evidence presented against Petitioner at his first trial, the Court finds that Petitioner's remaining assertions regarding the statements by the prosecutor and the detective at the second and third trials are insufficient to rebut the New Jersey Appellate Division's contrary findings of fact, are irrelevant, or are otherwise insufficient to show that its ruling was unreasonable under AEDPA.

*Thigpen*, 2021 WL 5895639, at *7.

Petitioner argues that, had the detective testified in the first trial and the jury heard him confess to making three false statements in his affidavit and the prosecutor say he approved the affidavit knowing it had false statements in it, "the jury would have found that the detective and trial prosecutor [were] not credible and [their] whole case was built on false statements." (ECF No. 15 at 4.) However, there is insufficient factual support for Petitioner's assertions that Staffordsmith and the prosecutor either knowingly included falsehoods in the affidavit or approved the affidavit knowing that it contained false statements. On the contrary, the New Jersey Appellate Division indicated that the detective made "mistakes" or "errors" that were not discovered by the prosecutor when he approved the affidavit. *See Taylor v. Horn,* 504 F.3d 416, 433 (3d Cir. 2007) ("Implicit factual findings are presumed correct under § 2254(e)(1) to the same extent as express factual findings. *Campbell v. Vaughn*, 209 F.3d 280, 285-86 (3d Cir. 2010).").

As the New Jersey Appellate Division noted, "[w]hile on the stand [at the second trial], "Staffordsmith also denied he 'put something in [the affidavit] knowing [ ] that it was wrong[,] explaining he 'wasn't aware there was a mistake at the time'" and that "he did not alert the assistant prosecutor who handled the case to the error." *Thigpen*, 2021 WL 5895639, at *3 (alterations in original); (*see also* ECF No. 1-2 at 3:8-:10; 12:14-14:24.) At the third trial, Staffordsmith likewise acknowledged that it was a "mistake" for the affidavit to read that either C.B. or B.N. told him that Petitioner was ordered to shoot Skyers by Ragland. *Thigpen*, 2021 WL 5895639, at *3 (*see also* ECF No. 1-2 at 18:2-22:24.) Petitioner acknowledges that "[t]his [d]etective says he made a *mistake* by putting three false statements in the Affidavit." (ECF No. 15 at 12 (emphasis added).) While he questions how the detective could make so many "mistakes" given his access to the witnesses' recorded statements and suggests that the falsities were knowingly included in the

affidavit, Petitioner fails to present clear and convincing evidence to rebut the New Jersey Appellate Division's contrary findings of fact.

During the second trial (and outside the presence of the jury), the state trial judge asked the prosecutor whether, "[a]t some point, was it pointed out there was a mistake [stating that C.B. said that Petitioner and Ragland took him to the crime scene]," and the prosecutor responded that it was, he had "access to the video" of C.B.'s statement, it was his "fault," and he would bring "that out on cross." (ECF No. at 11:8-12.) The judge indicated that the prosecutor could address such matters on cross-examination. (*Id.* at 11:13-14.) But the prosecutor never said that he knew there was a false statement in the affidavit at the time he approved it.

Additionally, neither the trial prosecutor nor the detective testified, nor was the search warrant affidavit used as evidence, at Petitioner's first trial. *See Epps*, 2025 WL 602983, at *6 (stating that obtaining a conviction through the knowing use of false evidence violates the Due Process Clause of the Fourteenth Amendment). The prosecutor also did not rely on the false statements in his remarks at the first trial. *See Marsh v. Att'y Gen. N.J.*, No. 23-3123, 2025 WL 943366, at *3 (3d Cir. 2025) (stating that a habeas petition is granted for prosecutorial misconduct when the prosecutor's remark so infected the trial with unfairness as to render the resulting conviction a denial of due process).

While the defense called Staffordsmith as a witness at the second and third trials, the prosecutor did not testify at Petitioner's trials. It is well established that the "[a]rguments, statements, remarks, openings, and summations of counsel are not evidence and must not be treated as evidence." (ECF No. 6-10 at 55:20-22 (jury instructions at the first trial).) In fact, at the second trial, the prosecutor objected to the defense questioning the detective regarding the "approval" of the search warrant affidavit on the grounds that it "wants to elicit that fact [that he approved the

affidavit] and try to embarrass [him] in front of the jury that [he] made a mistake." (ECF No. 1-2 at 9:5-8.) Defense counsel denied that this was his intention but instead insisted that he wanted to establish the importance of the detective being accurate because the document was submitted to a prosecutor for approval and then submitted to a judge for his signature. (*Id.* at 9:10-20, 12:5-8.) The prosecutor asked whether he had to recuse himself so he could offer testimony, and the state trial judge responded: "There's no question with regard to [the prosecutor] making any mistakes. The questions have to do with the detective taking the oath seriously and he indicated the mistake, it's a mistake, but as I understand it, the defense attorney is permitted to . . . ask questions with regard[s] to that mistake." (*Id.* at 10:9-19.) Petitioner's attorney confirmed that he was focused on the detective, not the prosecutor, and did not intend to "drag" the prosecutor "into this as being part of this mistake." (*Id.* at 10:23-11:7.) On Stafffordsmith's cross-examination, the trial court sustained the defense's objections to the prosecutor's questions stating that it was his mistake or fault because he was "testifying." (*Id.* at 13:4-14.)

In any event, the New Jersey Appellate Division reasonably determined that Petitioner was not prejudiced by counsel's failure to call Stafffordsmith as a witness at the first trial, or to otherwise object to Petitioner's prosecution and convictions on the grounds that the arrest warrant affidavit contained false statements. *Thigpen*, 2021 WL 5895639, at *7 (citing *Strickland*, 466 U.S. at 687-88). Assuming *arguendo* that there was no forensic or physical evidence directly implicating Petitioner in Skyers's murder, several witnesses, including but not limited to C.B. and B.N., provided testimony incriminating Petitioner at the first trial. *See id.* at *1-2. For example, Petitioner's former roommate, J.V., testified that Petitioner confessed to killing Skyers:

> he lured [Skyers] to the woods and told [Skyers] to
> walk up ahead of him and he shot [Skyers]. The first
> time the safety was on the gun, it didn't go off and
> [Skyers] turned around and said what are you doing?

> [Defendant] said, I'm just kidding, go ahead. And then [Skyers] turned around and [defendant] shot him again.
>
> According to J.V., defendant said that before the murder, Bloods members were discussing who would kill Skyers and defendant "was the only one that had the balls to do it." She also stated that defendant bragged: "I killed the kid, I could do it again, it's nothing to kill somebody."

*Id.*; (*see also* No. 6-6 at 147:4-150:2.)   Under the circumstances, it was not objectively unreasonable for the New Jersey Appellate Division to find that Petitioner failed to establish a reasonable probability of a different result "given that the State produced strong evidence of defendant's guilt through testimonial evidence."[8] *Id.* at *7.

### c.    Appellate Counsel Ineffectiveness

According to the New Jersey Appellate Division, "defendant failed to show how he was prejudiced by appellate counsel's purported errors," and, "[a]s the PCR judge aptly noted, PCR counsel neglected 'to . . . address what issues appellate counsel allegedly failed to raise.'"  *Id.* Similarly, in his submissions in this federal habeas proceeding, Petitioner does not identify any specific issues that his counsel on direct appeal "failed to raise."  But he does note in his Petition that "[m]y direct appeal lawyer said that she couldn't raise that issue [regarding the use of an affidavit with three false statements to arrest him] because it didn't come out in the [first] trial." (ECF No. 1 at 7.)  According to the New Jersey Appellate Division, Petitioner's appellate counsel could have raised "substantive contentions relating to the Staffordsmith affidavit . . . such as prosecutorial misconduct" on direct appeal.  *Thigpen*, 2021 WL 5895639, at *6 n.7.  As the Court

---

[8]    Petitioner further notes, while Staffordsmith was not called as a witness at his first trial, "the detective testified in both [his] second and third trial and [he] got 2 hung juries." (ECF No. 15 at 4.)  The second and third trials did result in hung juries on the charges of murder and possession of a gun for an unlawful purpose; however, the jury was also hung on the same two charges at the first trial, despite the fact Staffordsmith did not testify at Petitioner's first trial. *See Thigpen*, 2021 WL 5895639, at *1.

explains above, the New Jersey Appellate Division reasonably determined that, "[a]lthough defendant seeks relief based on Staffordsmith's affidavit, the record demonstrates that even if the three misstatements we have discussed were excised from the affidavit, the police still had probable cause to arrest him"—and that "the State produced strong evidence of defendant's guilt through testimonial evidence." *Id.* at 7 (citation omitted). Appellate counsel was not ineffective for failing to raise meritless misconduct arguments on appeal. *See McBride v. Kuhn*, No. 22-2016, 2025 WL 1119479, at *5 (D.N.J. Apr. 14, 2025).

Accordingly, Petitioner's claim of ineffective assistance of counsel is denied under the deferential standard of review established by 28 U.S.C. § 2254(d). The Court next considers Petitioner's substantive claim of misconduct.

**B.     The Substantive Misconduct Claim**

Petitioner claims that his Fourteenth Amendment rights were violated because of the detective's inclusion of three false statements in the arrest warrant affidavit, which was approved by the trial prosecutor knowing that it contained these falsehoods. (ECF No. 1 at 6.) Relying on *Franks*, Petitioner asserts that the detective either intentionally and knowingly put the false statements in the affidavit, or at least acted with a reckless disregard for the truth, and that, without these falsehoods, the police lacked the probable cause to arrest him. (*See* ECF No. 15 at 2, 6, 10-12.)

The New Jersey Appellate Division concluded that this claim was barred under New Jersey Court Rule 3:22-4 because it could have been brought on direct appeal. This claim has been procedurally defaulted and Petitioner fails to excuse the default. Furthermore, assuming *arguendo* that the claim is not defaulted, or that the procedural default is excused, the substantive claim of misconduct fails on the merits.

28

### 1.    Procedural Default

For a procedural default to occur, the state court rule must provide an "adequate" basis for the court's decision and the decision must be "independent of the merits of the federal claim." *Ross*, 118 F.4th at 565 (citing *Nara v. Frank*, 488 F.3d 187, 199 (3d Cir. 2007), *as amended* (June 12, 2007)). The New Jersey Appellate Division plainly stated that the claim was barred under New Jersey law. *See id.* ("Ordinarily, for procedural default, a state-court decision must contain a 'plain statement' that its ruling rests on such an adequate and independent state-law ground." (citing *Harris v. Reed*, 489 U.S. 255, 263 (1989)). Furthermore, it is undisputed that no misconduct claim was raised on direct appeal. (*See generally* ECF No. 6-19 (Pet'r's Direct App. Br.).)

New Jersey Court Rule 3:22-4 states:

> Any ground for relief not raised in the proceedings resulting in the conviction, or in a post-conviction proceeding brought and decided prior to the adoption of this rule, or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds:
>
>> (1) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or
>>
>> (2) that enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice; or
>>
>> (3) that denial of relief would be contrary to a new rule of constitutional law under either the Constitution of the United States or the State of New Jersey.
>
> A ground could not reasonably have been raised in a prior proceeding only if defendant shows that the factual predicate for that ground could not have been discovered earlier through the exercise of reasonable diligence. A denial of relief would be contrary to a new rule of constitutional law only if the defendant shows that the claim relies on a new rule of constitutional law, made retroactive to defendant's petition by the United States Supreme Court or the

29

Supreme Court of New Jersey, that was unavailable during the
pendency of any prior proceedings.

"The application of the Rule by the state court was 'adequate for the court's decision and
independent of the merits of the federal claim.'" *Kosch v. Att'y Gen. of N.J.*, No. 22-4814, 2025
WL 849601, at *2 (D.N.J. Mar. 18, 2025) (quoting *Ross*, 118 F.4th at 565); *see also Vaughn v.
Ricci*, No. 10-1397, 2024 WL 1366482, at *12 (D.N.J. Apr. 1, 2024) ("New Jersey Court Rule
3:22-4 is an independent and adequate state law ground. *See Cabrera v. Barbo*, 175 F.3d 307, 314
(3d Cir. 1999) (N.J. Ct. R. 3:22-4 provided an independent and adequate state ground to
procedurally bar the petitioner's federal habeas claim.)."), *appeal filed*, No. 24-1822 (3d Cir. May
3, 2024). "Therefore, [Petitioner's substantive claim] is procedurally defaulted." *Vaughn*, 2024
WL 1366482, at *12.

### 2.    Cause and Prejudice

"Procedural default may be excused where Petitioner 'can demonstrate cause for the
default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that
failure to consider the claims will result in a fundamental miscarriage of justice.'" *Id.* (quoting
*Cristin v. Brennan*, 281 F.3d 404, 412 (3d Cir. 2002)). Ineffectiveness of counsel may constitute
cause where it rises to the level of a Sixth Amendment violation. *See id.* Because Petitioner alleges
ineffective assistance of counsel (*see* ECF No. 15 at 4), the Court construes Petitioner's
submissions as asserting cause for Petitioner's default of his *Franks* claim.

As discussed in the prior section, *see supra* Section III.A., the New Jersey Appellate
Division rejected Petitioner's freestanding claim of ineffective assistance of counsel on the merits,
and this adjudication was neither contrary to, nor an unreasonable application, of clearly
established federal law as determined by the United States Supreme Court, nor was it based on an
unreasonable factual determination in light of the evidence presented in the state court proceeding,

under 28 U.S.C. § 2254(d). However, § 2254(d) does not apply to the question of whether ineffective assistance of counsel constitutes "cause" for a procedural default. In *Fischetti v. Johnson*, 384 F.3d 140 (3d Cir. 2004), the Third Circuit concluded that, in contrast, "AEDPA does not establish a statutory high hurdle for the issue of cause," *id.* at 154-55. Noting that the "Supreme Court's pronouncement in *Coleman* [recognizing that ineffective assistance of counsel at trial or on direct appeal is cause sufficient to excuse the default] applied no AEDPA-style 'unreasonable application' test in determining the existence of cause," *Fischetti* stated that "[t]he constitutional error suffices . . . to establish cause for the procedural default." *Id.* at 155; *see also Tavarez v. Larkin*, 814 F.3d 644, 650 & n.3 (2d Cir. 2016) (noting the existence of a circuit split on the issue of whether *de novo* review or AEDPA deference applies where a habeas petitioner advances a claim of ineffective assistance as cause to excuse a procedural default and indicating that the Third Circuit has applied *de novo* standard in such circumstances).

Applying a *de novo* standard, the Court concludes that Petitioner fails to establish cause. Petitioner does not establish a reasonable probability of a different result if his counsel at the first trial had either challenged the affidavit under *Franks*, had called Staffordsmith as a witness, or had otherwise objected to Petitioner's prosecution and convictions on the grounds that the arrest warrant affidavit included false statements, or if appellate counsel had raised these issues on direct appeal. *See Strickland*, 466 U.S. at 687-88; *see also Minaya*, 2023 WL 3338626, at *3 (stating that attorney does not create prejudice by failing to raise a meritless argument). Redacting the false statements from the affidavit, the balance of the affidavit provided probable cause to arrest the Petitioner. Specifically, it included statements from C.B. and B.N.—which were consistent with each other and the physical aspects of the homicide—that Petitioner confessed to murdering Skyers and that Ragland ordered the murder because Skyers was a "snitch." (ECF No. 15 at 8-9.)

31

Additionally, the prosecution did not use the false statements in the affidavit against Petitioner at his first trial. However, it did present strong incriminating evidence against Petitioner, including testimony from Petitioner's former roommate in which she stated that Petitioner remorselessly confessed to luring Skyers into the woods and shooting him. (*See* No. 6-6 at 147:4-150:2.)

To satisfy the "cause and prejudice" rule, Petitioner must also establish prejudice for his procedural default. "To demonstrate actual prejudice, Petitioner would need to show that a constitutional violation 'worked to his actual and substantial disadvantage." *Grimsley v. United States*, No. 22-7207, 2025 WL 1111301, at *9 (D.N.J. Apr. 14, 2025) (quoting *Shinn*, 596 U.S. at 379-80). Given the remaining contents of the affidavit and the substantial incriminating evidence presented at the first trial, Petitioner cannot meet this burden. *See Avila v. Att'y Gen. of N.J.*, No. 18-9422, 2023 WL 8253437, at *5 (D.N.J. Nov. 29, 2023) ("In the absence of ineffective assistance, Petitioner cannot establish cause and prejudice for his procedural default.").

### 3.    Actual Innocence

According to Petitioner, "the truth and the facts" prove that he is "innocent." (ECF No. 14 at 1.) A petitioner can avoid procedural default by establishing a "fundamental miscarriage of justice," which requires a plausible showing of actual innocence. *See Epps*, 2025 WL 602983, at *4. In this context, actual innocence refers to factual innocence, not legal insufficiency. *See Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012). To satisfy this standard, the petitioner must: (1) "present new, reliable evidence;" and (2) "show by a preponderance of the evidence that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018) (cleaned up). Assuming *arguendo* that Petitioner presents "new, reliable evidence," and, given the strong incriminating evidence that was presented at the first trial, *see supra* Sections III.A.2.ii, III.B.3., Petitioner fails

to show by a preponderance of the evidence that it is more likely than not that no reasonable juror would have convicted him in the light of the false statements in the affidavit.[9]

### 4.    The Merits of the Substantive Misconduct Claim

Finally, even if not procedurally defaulted (or if the default were excused), the Court concludes that Petitioner's substantive misconduct claim fails on the merits. As the Court has explained, the balance of the affidavit provided probable cause to arrest Petitioner. Furthermore, the State did not use or otherwise refer to the false statements in the arrest warrant affidavit at his first trial; however, it did present strong evidence of his guilt. (*See* No. 6-6 at 147:4-150:2; ECF No. 15 at 8-9.) Accordingly, the State did not obtain Petitioner's convictions through its "knowing use of false evidence." *Epps*, 2025 WL 602983, at *6 (citing *Napue v. Illinois*, 370 U.S. 264, 269 (1959)). In fact, the prosecution did not mention the "false evidence" in the detective's affidavit at the trial resulting in Petitioner's convictions on charges of conspiracy to commit murder and unlawful possession of a weapon. *See Marsh*, 2025 WL 943366, at *3 (stating that a habeas petition is granted for prosecutorial misconduct when the prosecutor's remark so infected the trial with unfairness as to render the resulting conviction a denial of due process).

### C.    Evidentiary Hearing

Petitioner requests an evidentiary hearing on the grounds that the State did not produce any evidence tying him to the alleged crimes, the detective "basically planted evidence on [him] and the trial prosecutor approved that affidavit with the planted evidence in it knowing it had false statements," and "[he] ha[s] been in prison 14 years for a crime [he] did not do, and [he] truly believe[s] an evidentiary hearing will prove [his] innocence." (ECF No. 25 at 1.) Specifically,

---

[9]    To the extent that Petitioner intends to assert a freestanding claim of actual innocence, the Supreme Court has not yet recognized the existence of such a claim, and, at the very least, Petitioner must satisfy the "gateway" standard, which Petitioner has failed to meet. *See Avila*, 2023 WL 8253437, at *11.

Petitioner wishes to call as witnesses Staffordsmith, the trial prosecutor, and his counsel on direct appeal. (*Id.*)

"Petitioner is not eligible for an evidentiary hearing because deferential review under § 2254(d) is limited to the record that was before the state courts that adjudicated the claim on its merits." *Reeves v. Att'y Gen. of N.J.*, No. 20-7842, 2024 WL 4319189, at *25 (D.N.J. Sept. 27, 2024) (citing 28 U.S.C. § 2254(d)(2); *Nobles v. Davis*, No. 19-10607, 2022 WL 861850, at *3 (D.N.J. Mar. 23, 2022)).  Second, the Court is "limited to the state court record in making its determination" whether a petitioner has procedurally defaulted on a claim or, if he has defaulted, has then established cause and prejudice, or a fundamental miscarriage of justice, excusing the default. *Amoop v. Att'y Gen. of N.J.*, No. 20-15473, 2025 WL 854719, at *4 (D.N.J. Mar. 19, 2025) (citing *Shinn*, 596 U.S. at 375-76), *appeal filed*, No. 25-1763 (3d Cir. Apr. 22, 2025). Finally, in any event, "[w]hether to order a hearing is within the sound discretion of the trial court," and depends on whether the hearing "would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000).  Petitioner fails to forecast any testimony, beyond that already contained in the state court record, that would help his claims, or provide any other grounds indicating that an evidentiary hearing would potentially advance his claims. *See id.*

Accordingly, Petitioner's request for an evidentiary hearing is denied.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c)(1), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) . If the "district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," a certificate should issue if the petitioner shows that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying these standards, this Court finds that a certificate of appealability shall not issue in this case.

## V.     CONCLUSION

For the reason set forth above, and other good cause shown, the Petition is **DENIED in part** and **DISMISSED in part**. The Court **DENIES** Petitioner's ineffectiveness claim and **DISMISSES** his substantive misconduct claim. A certificate of appealability shall not issue. An appropriate Order follows.

GEORGETTE CASTNER
United States District Judge

Dated: May 7 , 2025